# United States Court of Appeals
## For the First Circuit

No. 23-1854

JOSEPH SEGRAIN,

Plaintiff, Appellant,

v.

WALTER DUFFY, alias, individually and in his official capacity
as a Correctional Officer at the Rhode Island Department of
Corrections; JAMES GLENDINNING, alias, individually and in his
official capacity as a Correctional Officer at the Rhode Island
Department of Corrections; RHODE ISLAND DEPARTMENT OF
CORRECTIONS; WAYNE T. SALISBURY, JR., alias, in his official
capacity as Acting Director at the Rhode Island Department of
Corrections; RONALD MELEO, alias, individually and in his
official capacity as a Correctional Officer at the Rhode Island
Department of Corrections,

Defendants, Appellees,

PATRICIA ANNE COYNE-FAGUE, alias, individually; JOHN DOES 1-5,
alias, individually and in their official capacity as
Correctional Officers at the Rhode Island Department of
Corrections,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Montecalvo, Lipez, and Rikelman,
<u>Circuit Judges</u>.

---

    Jared A. Goldstein, with whom Prisoners' Civil Rights Litigation Clinic, Roger Williams University School of Law was on brief, for appellant.

    James J. Arguin, Special Assistant Attorney General, for appellees.

———————————————

September 23, 2024

———————————————

**MONTECALVO, <u>Circuit Judge</u>**.  This appeal concerns Joseph Segrain's civil lawsuit against the Rhode Island Department of Corrections and several correctional officers for alleged violations of his rights under the Eighth Amendment and various Rhode Island state laws.  During all times relevant to this case, Segrain was detained at Rhode Island's Adult Correctional Institutions' (ACI's) maximum-security facility in Cranston.  He alleges that officers used excessive force against him on June 28, 2018, when they executed a leg-sweep maneuver that knocked him to the ground, sprayed him in the face with pepper spray, and unnecessarily prolonged his pain from the pepper spray by holding him in a cell while handcuffed for a significant time before allowing him a decontamination shower.  The district court granted summary judgment in favor of the officers on all federal and state claims, and Segrain appealed.  For the reasons explained below, we <u>reverse</u> the district court's judgment as to the 42 U.S.C. § 1983 claim that appellee Officer Walter Duffy's use of pepper spray violated Segrain's Eighth Amendment rights, <u>vacate</u> the district court's judgment as to the Rhode Island Constitution Article I, Section 8 claim regarding Duffy's use of pepper spray, and <u>remand</u> for further proceedings consistent with this opinion.  We <u>affirm</u> the district court's judgment on all other claims.

## I. Background

### A. Factual Background

"We recount the facts in the light most favorable to [Segrain], who was the non-moving party at summary judgment." _Ing_ v. _Tufts Univ._, 81 F.4th 77, 79 (1st Cir. 2023) (quoting _Planadeball_ v. _Wyndham Vacation Resorts, Inc._, 793 F.3d 169, 172 (1st Cir. 2015)), _cert. denied_, No. 23-1115, 2024 WL 2116351 (U.S. May 13, 2024).

### 1. The Leadup to the Alleged Constitutional Violations

Segrain was housed in the Disciplinary Confinement Unit of the ACI, operated by the Rhode Island Department of Corrections (RIDOC), when, on the morning of June 28, 2018, he was escorted from his cell to an area known as the "flats" for shower and recreation time. A corrections officer issued Segrain shower supplies, including a brush, a mirror, and a razor.

About five minutes after Segrain arrived in the flats, appellee Officer Ronald Meleo informed Segrain that he would have only fifteen minutes of out-of-cell time. Segrain debated with Meleo over whether he was entitled to more out-of-cell time and whether he could report a grievance prior to being returned to his cell. In response to the disagreement, other officers were notified about a potential issue with an inmate refusing to leave the flats. Appellee Officers Walter Duffy and James Glendinning then came to the officers' area, a room separated from the flats

- 4 -

by a barred gate.   After several minutes of discussion, Duffy, Glendinning, and Meleo, as well as three other corrections officers, walked from the officers' area through the barred door into the flats.   Duffy brought pepper spray with him and told Segrain that force might be used against him if he did not comply. Duffy directed Glendinning to handcuff Segrain, and Segrain complied and was handcuffed without incident.

When Glendinning handcuffed Segrain, Segrain was still holding some of the shower supplies (at least the mirror and the razor) that had been issued to him a few minutes before.   Normally at the facility, the corrections officer who issued the shower supplies is responsible for collecting them from an inmate before the inmate is handcuffed and escorted to his cell.   No officer asked Segrain to return his shower supplies or gave him an opportunity to do so.   The video appears to show that, consistent with Segrain's account, Segrain made no attempt to hide the shower supplies from the officers -- the supplies were clearly visible in his hands when the officers entered the flats and handcuffed him.[1]

After Segrain was handcuffed, Glendinning escorted Segrain from the flats through the doorway into the officers' area.

---

[1] Though the appellees contend that Segrain was concealing the razor underneath the mirror and in his clenched fist, a reasonable jury could disagree.   We therefore assume, for the purposes of summary judgment, that Segrain was not concealing or attempting to conceal the razor.

Segrain walked in the direction in which he was escorted without
physical protest.  Six officers total -- including Glendinning,
Duffy, and Meleo -- were present in the flats while Segrain was
handcuffed and escorted out, and one additional officer was present
in the officers' area for at least a portion of that time period.

### 2. The Leg-Sweep Maneuver

The exact timing of the events that followed is central
to the substantive disputes in this case, and thus we discuss their
timing in relation to the time stamps on the submitted video
recordings of the officers' area and the holding cell.  The video
recordings do not include sound and thus do not clarify who said
what, and when, during these events.  While escorting Segrain out
of the flats and into the officers' area, Glendinning noticed a
mirror in Segrain's left hand at approximately 4:45 on the
officers' area video.  Glendinning testified that he swatted the
mirror out of Segrain's hand and then noticed the razor in
Segrain's right hand -- Glendinning appears to notice the razor at
4:49 on the officers' area video.

Segrain testified that Glendinning stated at that point,
"He has a razor. Drop the razor."[2]  Glendinning then applied a leg

---

[2] The district court concluded that Duffy also verbally
ordered Segrain to drop the razor after finding that Segrain failed
to point to evidence genuinely disputing this issue.  See Segrain
v. Coyne-Fague, No. 19-00372, 2023 WL 6142234, at *2 n.8 (D.R.I.
Sept. 20, 2023).  We disagree.  Duffy and Glendinning submitted
affidavits that only mention an order to drop the razor by

sweep to knock Segrain to the ground at 4:51 on the video.   Only
about one or two seconds appear to have elapsed between the time
that Glendinning noticed the razor and when he applied the leg
sweep.   Segrain argues that one or two seconds is not enough time
for Glendinning to have both ordered Segrain to drop the razor and
given him time to comply with that order.

The officers' area video does not show the precise moment
that Segrain dropped the razor (the angle of the video is such
that Segrain's hands are blocked by his body at the relevant time),
but Segrain landed on the floor at 4:53 and the razor can be seen
on the floor behind Segrain's back in the video at 4:54.   Segrain
testified that he dropped the razor while falling or just after he
hit the ground, which is consistent with the video.[3]

---

Glendinning but not by Duffy.  And Glendinning testified in his
deposition that he ordered Segrain to drop the razor but he was
not sure whether there were further commands.   Viewing this
evidence in the light most favorable to Segrain, we accept at this
juncture that Duffy did not issue an order to Segrain to drop the
razor.

[3] The district court concluded that "the video evidence
demonstrates the razor fell to the ground _after_ Defendant
Glendinning pinned [Segrain] to the ground." _Segrain_, 2023 WL
6142234, at *2 n.10.  However, given Segrain's testimony and the
fact that the video does not show the precise moment Segrain
dropped the razor, viewing the facts in the light most favorable
to Segrain, it is possible that he dropped the razor just prior to
hitting the ground.

### 3. Use of Pepper Spray

Around the time Segrain landed on the floor, or shortly thereafter, at 4:54 in the video, Duffy sprayed Segrain with pepper spray. At 4:56, the video shows Glendinning picking the razor up off the floor and later tossing it aside, out of Segrain's reach. Duffy was standing above the scene at that time and appeared to have a clear view of Glendinning when Glendinning grabbed the razor and tossed it aside. Yet after Glendinning picked up the razor, Duffy sprayed a second burst of pepper spray into Segrain's face at approximately 4:57 on the video.[4] Segrain testified that from "what [he] recall[s]," he was not "holding the . . . razor by the time the [pepper spray] sprayed," but it is not clear whether that statement referenced the first spray, the second spray, or both. Segrain experienced intense pain from the pepper spray -- he was

---

[4] The district court concluded that "[b]ased on the video evidence, . . . Duffy applied a second microburst" of pepper spray "almost simultaneous with [Segrain] dropping the razor." Segrain, 2023 WL 6142234, at *2. The officers' area video makes clear that Segrain dropped the razor at least two seconds before Duffy sprayed Segrain for a second time. The significance of this delay and whether Duffy could see, and did in fact see, the dropped razor at the time are issues on which a reasonable juror could find in favor of Segrain. Thus, at the summary judgment stage, we assume the same.

Additionally, viewing the facts in the light most favorable to Segrain, the pepper spray was discharged directly into Segrain's face based on the video of the holding cell, which shows Segrain's face appearing visibly wet soon after Duffy sprayed the pepper spray.

temporarily blinded, felt unable to breathe, and felt like he was going to die.

### 4. Delayed Decontamination

The officers then escorted Segrain into a holding cell that was accessible from the officers' area.  They left him in the holding cell with his hands still handcuffed behind his back and his face wet with pepper spray for approximately thirteen minutes. The video of the inside of the holding cell shows Segrain wandering around blindly in the cell while handcuffed.  He appears visibly in pain and appears to be trying to say something to the officers. Consistent with the video, Segrain testified that he called out in pain, stating that he could not breathe and asking the officers to take the handcuffs off so that he could wash his face.  Though several officers remained just outside the cell during the time Segrain was held there, the officers do not appear to pay much attention to Segrain, and Segrain testified that "[t]hey're not saying nothing.  Nobody [wa]s doing anything."  Some of the officers appear to be chatting with each other periodically. Officer Meleo also cleaned up the puddle of pepper spray on the ground while Segrain was in the holding cell.

The video shows Segrain, with his eyes shut, feeling around the cell with his back and handcuffed hands, but he did not find the sink for several minutes.  When he did eventually encounter the sink in the corner of the cell, he managed to turn

it on with his hands still cuffed.  He then repeatedly stuck his face into the stream of water flowing from the sink but did not have the use of his hands to rub the water into his eyes or face. The water eventually began to overflow the sink, and Segrain repeatedly stuck his face into the full sink basin and the water stream overflowing out of the sink.  The water flowed out of the cell into the officers' area, and an officer brought a mop to the area but left it leaning against the wall without using it to mop up the water.  The mop remained leaning against the wall, unused, until sometime after Segrain was escorted out of the cell and through the flooded area.

After holding Segrain in the cell for about thirteen minutes, the officers eventually opened the cell door and led him away.  The video evidence does not show the exact length of time between when Segrain was released from the cell and when his decontamination shower took place.  He testified that it was "25 minutes or longer . . . after [he] got sprayed" before he received a shower and that he saw a nurse for a medical evaluation "like an hour later, if that."  The medical evaluation notes state that the nurse "found no bruises or injuries, inmate is fine."  Segrain testified that the incident caused him to have long-term, nearly constant anxiety and mental anguish.

The appellees have asserted inconsistent reasons for the delay in Segrain's decontamination after the incident.  Duffy

- 10 -

initially asserted in an affidavit that the delay was due to "Segrain's act of flooding the cell" when he eventually turned on the sink himself because "the area had to be cleaned for safe transport."  Duffy then testified in his deposition that the delay was initially due to the need to find enough staff to move Segrain to the decontamination area.

### 5. Use-of-Force Policy

Segrain alleges that the officers' conduct during these events violated RIDOC's use-of-force policy.  That policy states that "[t]he use of force against an offender is authorized when an Officer reasonably believes such force is necessary to accomplish," in relevant part, "[p]rotection of self or others, . . . [c]ompliance with rules and regulations when other methods of control are ineffective or insufficient, . . . [or] [p]rotection of the offender from self-inflicted harm."  However, "RIDOC Officers may only use force when necessary," and "[i]f force is in fact required, Officers may only use the reasonable force necessary to accomplish the required task."  Excessive force is prohibited under all circumstances, and "[o]nce the threat or resistance displayed by a subject stops or diminishes, force utilized by Officers in response must cease or diminish."  Additionally, "[b]efore using force on an offender, Officers, when time and circumstances permit, shall issue a verbal warning to the

offender[] to stop and desist and obey the order of Officers, clearly stating that force will be used if not stopped."

## B. Procedural Background

On July 10, 2019, Segrain filed the present lawsuit in the United States District Court for the District of Rhode Island asserting claims under the federal Constitution and 42 U.S.C. § 1983, as well as under Rhode Island law. Early in the litigation, the parties stipulated to dismiss counts one through three in the complaint and all individual (but not official) capacity claims against the director of the Department of Corrections.[5] After that stipulation, the following claims remained: a § 1983 claim alleging excessive use of force in violation of the Eighth Amendment against Duffy, Glendinning, and Meleo (count six); a state law claim of negligent infliction of emotional distress against the Rhode Island Department of Corrections, Wayne T. Salisbury, Jr. (in his official capacity as Director at the Rhode Island Department of Corrections), Duffy, Glendinning, and Meleo (count four); state law claims of battery, intentional infliction of emotional distress, and excessive force against Duffy and Glendinning (counts five, eight, and nine); and

---

[5] The director originally named in the complaint and who held that position at the time of the stipulation was Patricia Coyne-Fague. Pursuant to Federal Rule of Appellate Procedure 43(c)(2), the current director, Wayne T. Salisbury, Jr., is automatically substituted as a party for the remaining official capacity claims against the director.

a claim of violation of the state constitutional prohibition on cruel and unusual punishment against all defendants (count seven). Duffy, Glendinning, and Meleo are sued in both their individual and official capacities.

The defendants filed a motion for summary judgment on all remaining claims. The district court granted that motion in its entirety on September 20, 2023. Specifically, relevant to this appeal, the district court found that no reasonable jury could find that any of the officers' conduct constituted an Eighth Amendment violation under the U.S. Constitution and granted summary judgment on that basis, without mentioning or discussing the officers' asserted qualified immunity defense (an issue that both parties briefed before the district court). See Segrain v. Coyne-Fague, No. 19-00372, 2023 WL 6142234, at *6-11 (D.R.I. Sept. 20, 2023). Then, after deciding to exercise supplemental jurisdiction over the remaining state law claims despite its dismissal of all federal claims, the district court individually considered and granted summary judgment in defendants' favor on each of Segrain's five remaining state law claims as to all defendants. Id. at *11-12. Segrain subsequently filed this timely appeal of the district court's grant of summary judgment on the Eighth Amendment and state law claims.

## II. Standard of Review

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party and "giving that party the benefit of any and all reasonable inferences." Ing, 81 F.4th at 82 (quoting Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005)). Summary judgment is appropriate "when the record reflects no genuine issue as to any material fact and indicates that the moving party is entitled to judgment as a matter of law." Penate v. Sullivan, 73 F.4th 10, 17 (1st Cir. 2023) (quoting Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009)).

## III. Discussion

Segrain appeals the district court's decision on his Eighth Amendment claim asserting multiple violations by different officers, as well as its decision on five state law claims. We discuss the Eighth Amendment claim first, assessing each of the alleged violations by different officers separately, and then proceed to the state law claims.

### A. Eighth Amendment Excessive Force Claim

Section 1983 provides a cause of action for monetary damages against state actors sued in their individual capacities "who acted under color of state law to deprive plaintiff of a right guaranteed by the Constitution or by federal law." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002); see also 42 U.S.C. § 1983;

Hafer v. Melo, 502 U.S. 21, 23 (1991).  The Eighth Amendment
prohibits infliction of "cruel and unusual punishments."  U.S.
Const. amend. VIII.  "A claim of cruel and unusual punishment in
violation of the Eighth Amendment has two components."  Staples v.
Gerry, 923 F.3d 7, 13 (1st Cir. 2019) (quoting Wright v. Goord,
554 F.3d 255, 268 (2d Cir. 2009)).  One component is "objective,
focusing on the conduct's effect," and the other is "subjective,
focusing on the defendant's motive for his conduct."  Id.

The objective prong of this analysis requires an injured
party to show that "the alleged wrongdoing is objectively 'harmful
enough' to establish a constitutional violation."  Hudson v.
McMillian, 503 U.S. 1, 8 (1992) (quoting Wilson v. Seiter, 501
U.S. 294, 303 (1991)).  "[D]e minimis uses of physical force" are
typically "exclude[d] from constitutional recognition," as long as
"the use of force is not of a sort repugnant to the conscience of
mankind."  Wilkins v. Gaddy, 559 U.S. 34, 38 (2010) (quoting
Hudson, 503 U.S. at 9-10).  The Supreme Court has made clear that
it is the force used, and not the injury incurred, that is the
focus of the objective prong analysis.  See id.  To this end, it
has explained that "[i]njury and force . . . are only imperfectly
correlated, and it is the latter that ultimately counts.  An inmate
who is gratuitously beaten by guards does not lose his ability to
pursue an excessive force claim merely because he has the good
fortune to escape without serious injury."  Id.; see also id. at

37 (explaining that there is no "significant injury" threshold requirement to state an excessive force claim, but that the absence of injury is still one of many relevant considerations under the subjective prong analysis).

The subjective prong of the Eighth Amendment excessive force analysis "turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Whitley v. Albers, 475 U.S. 312, 320–21 (1986) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The factors relevant to this determination, known as the "Whitley factors," include:

> [(1)] the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials, [(2)] the need for the application of force, [(3)] the relationship between the need and the amount of force that was used, [(4)] the extent of the injury inflicted, and [(5)] any efforts made to temper the severity of a forceful response.

Staples, 923 F.3d at 13 (cleaned up) (quoting Whitley, 475 U.S. at 321).

Even if a plaintiff produces sufficient evidence from which a reasonable jury could find an Eighth Amendment violation, a defendant official may still be entitled to summary judgment on that constitutional claim based on qualified immunity. Officers sued in their individual capacity "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory

or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  To decide whether a defendant is entitled to summary judgment based on qualified immunity, "[w]e often follow 'a two-step approach.'"  Perry v. Spencer, 94 F.4th 136, 146 (1st Cir. 2024) (en banc).  We first consider "whether there is a genuine issue of disputed fact that would allow a reasonable finder of fact to determine that the defendant violated the plaintiff's federal constitutional rights."  Id.  Second, we evaluate "whether the right that the plaintiff can supportably show was violated was clearly established at the time of the defendant's alleged violation."  Id.  Importantly, the court need not take these two steps in order; it may choose to begin with the second step and, if the unlawfulness of the conduct was not clearly established, it need not reach the first step at all.  See id.; Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017).

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what [they are] doing' is unlawful."  Wesby, 583 U.S. at 63 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  "A rule is clearly established either when it is 'dictated by controlling authority or a robust consensus of cases of persuasive authority.'"  Irish v. Fowler, 979 F.3d 65,

76 (1st Cir. 2020) (quoting Wesby, 583 U.S. at 63).  "A 'robust consensus' does not require the express agreement of every circuit.  Rather, sister circuit law is sufficient to clearly establish a proposition of law when it would provide notice to every reasonable officer that [their] conduct was unlawful."  Id.; see also Perry, 94 F.4th at 164.

The Supreme Court has also explained that "'general statements of the law are not inherently incapable of giving fair and clear warning' to officers," White v. Pauly, 580 U.S. 73, 79-80 (2017) (per curiam) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)), and "[a] plaintiff need not find an identical case concluding that a constitutional violation occurred," Penate, 73 F.4th at 18.  However, "in the light of pre-existing law the unlawfulness must be apparent."  White, 580 U.S. at 79-80 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Segrain alleges that multiple separate actions by the officers on June 28, 2018 constitute Eighth Amendment violations, but the district court granted summary judgment in the officers' favor on all grounds.  We consider each in turn.

### 1. Leg Sweep by Officer Glendinning

First, Segrain argues that Officer Glendinning used excessive force against him in violation of the Eighth Amendment when he executed a leg sweep to knock Segrain to the ground.  The district court ruled that the leg sweep did not meet the standard

for either the objective or the subjective prongs of the analysis
and thus was not an Eighth Amendment violation.  See Segrain, 2023
WL 6142234, at *7-8.[6]  But we "may affirm the judgment on any
ground made manifest by the record."  Minturn v. Monrad, 64 F.4th
9, 14 (1st Cir. 2023).  We affirm the dismissal of the leg sweep
claim against Glendinning based on the second prong of the
qualified immunity analysis: we hold that Glendinning is entitled
to qualified immunity on this claim because Segrain has not
established that the leg sweep constituted a violation of a clearly
established right as of June 28, 2018.  And given this conclusion,
we need not reach the question of "whether under the facts alleged
[Glendinning's leg sweep] conduct violated a constitutional

---

[6] The district court held that a reasonable jury could not
find that the leg sweep "was objectively harmful enough to
establish a constitutional violation." Id. at *8 (quoting Staples,
923 F.3d at 13).  In doing so, the district court focused on the
lack of significant injury to Segrain and asserted that "[i]n
response to Defendants' motion [for summary judgment], [Segrain]
has not pointed to any evidence to suggest that the leg sweep
caused anything other than an injury that is de minimis."  Id.

We agree with Segrain that the district court's objective
prong analysis of the leg sweep reflects a mistaken view of the
legal standard for the objective prong of the excessive force
analysis.  The Supreme Court has emphasized that, although "[t]he
extent of injury may . . . provide some indication of the amount
of force applied," it is the force used, rather than the injury
incurred, that "ultimately counts" in determining whether the
objective prong is satisfied. Wilkins, 559 U.S. at 37-38.  And it
has overturned lower court decisions for improperly denying
excessive force claims based on the supposedly de minimis nature
of the injuries incurred rather than the severity of the force
used. See id. at 39-40; Hudson, 503 U.S. at 4, 9-10.

right."  Johnson v. City of Biddeford, 92 F.4th 367, 375 n.6 (1st
Cir. 2024); see also Perry, 94 F.4th at 146 ("We have discretion
to bypass the first step [of the qualified immunity analysis] if
we conclude that the right was not clearly established at the time
of its alleged violation.").

Segrain does not point us to either a First Circuit case
or a sufficient consensus of persuasive authority clearly
establishing that Glendinning's use of a leg sweep under the
circumstances was an Eighth Amendment violation.  Rather, Segrain
references only two out-of-circuit decisions, both published prior
to June 28, 2018, in support of his argument that the leg sweep
could constitute such a violation.[7]  The primary case he cites is
Griffin v. Hardrick, a Sixth Circuit case in which the plaintiff,
a person detained pre-trial, alleged that two officers each grabbed
one of her arms and led her down a hallway after she "act[ed] in
a non-compliant manner with regard to . . . instructions she
received from [a] nurse."  604 F.3d 949, 951 (6th Cir. 2010).  When
the plaintiff resisted, one of the officers "stuck out his leg to
trip" her (an action that the officer referred to as a "leg-sweep

---

[7] Segrain also references a district court decision concluding
that the plaintiff had stated a claim for excessive force based on
an incident where he was body slammed onto a concrete floor twice
and broke several bones.  See Taylor v. Emps. at Sumner Co. Jail,
No. 19-00401, 2019 WL 4860628, at *7 (M.D. Tenn. Oct. 2, 2019).
That decision was published too late to demonstrate that
Glendinning's use of a leg sweep on June 28, 2018, was a clearly
established constitutional violation.

maneuver"). Id. at 952. The leg sweep caused her to fall to the floor, but as she did so, the second officer accidentally fell on top of her and fractured her tibia. Id. at 951-52. Analyzing the claim under the Eighth Amendment excessive force standard, the Sixth Circuit held that, because the officer who executed the leg sweep "d[id] not dispute that [the plaintiff] suffered serious pain, . . . the objective element [was] satisfied." Id. at 954. Under the subjective element, however, the court found that the plaintiff's actions "gave [the officer] a reasonable basis to believe that force would be necessary to control [her]," and that "no reasonable jury could find that [the officer] 'evinced such wantonness . . . as is tantamount to a knowing willingness' that [the plaintiff's] injury occur." Id. at 955-56 (quoting Whitley, 475 U.S. at 321). Thus, the court affirmed the grant of summary judgment in the officer's favor. Id. at 956.

Griffin does not provide clear notice to every reasonable officer that conduct such as the leg sweep Glendinning executed against Segrain under those circumstances was unlawful in 2018. The Griffin court determined that the objective element was satisfied based on a lack of dispute that the detained person "suffered serious pain." Id. at 954. But as we explained above, the relevant question is whether the force applied, not the injury incurred, was greater than de minimis.

Segrain also cites Treats v. Morgan, a case in which the plaintiff, an incarcerated person, alleged that he was "[pepper] sprayed without warning, thrown down to the floor, and handcuffed" by correctional officers.  308 F.3d 868, 872 (8th Cir. 2002). Those uses of force occurred after he declined one officer's demand that he take a copy of a form he had signed acknowledging the confiscation of a radio from his cell and sought to speak with a lieutenant about whether taking the copy was mandatory.  Id. at 870.  The plaintiff testified that he "did not intentionally disobey [the officer], use profanity or abusive language, or threaten any correctional officer."  Id. at 872.  The Eighth Circuit found that a reasonable jury could conclude that the correctional officers' conduct of pepper spraying the plaintiff and throwing him to the ground violated his clearly established constitutional rights.  Id. at 875.

To demonstrate clearly established law, cases cited need not be "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741.  Treats is analogous in many ways to Segrain's case under his version of the facts.  However, Treats alone is far from the type of "robust consensus of cases of persuasive authority" necessary to meet the "clearly established" standard. Wesby, 583 U.S. at 63.  Accordingly, Glendinning is entitled to qualified immunity on the leg sweep Eighth Amendment claim.

## 2. Two Pepper Sprays by Officer Duffy

Segrain next argues that the district court erred in concluding that no reasonable jury could find that Duffy's use of pepper spray constituted an Eighth Amendment violation. We begin by assessing this claim first under the objective and then the subjective prongs of the Eighth Amendment excessive force standard. We find that a reasonable jury could hold that, in sum, the use of pepper spray amounted to unconstitutional excessive force. We then proceed to assess Duffy's qualified immunity defense and conclude that he is not entitled to qualified immunity at this stage of litigation. Accordingly, we vacate the district court's judgment as to this claim and remand for further proceedings in line with this opinion.

### a. Objective Prong

Under the objective prong, the district court concluded that "the evidence demonstrates that Defendant Duffy used the minimal amount of force necessary to maintain order." Segrain, 2023 WL 6142234, at *9. However, the district court based this conclusion on its view of the timing of Duffy's two uses of pepper spray in relation to the time at which Segrain dropped the razor. See id. The district court explained the sequence of events as follows:

> As Defendant Glendinning applied the leg sweep, [Segrain] continued to grasp the razor, posing a serious threat to himself and others.

- 23 -

> By the time [Segrain] hit the floor the razor
> was still in his hands.  It was not until the
> second use of pepper spray that [Segrain]
> dropped the razor and Defendant Duffy heard
> Defendant Glendinning inform the other
> officers that [Segrain] dropped the razor.
> Once Defendant Glendinning informed Defendant
> Duffy that he released the razor, Defendant
> Duffy ceased the use of the pepper spray.

Id.  As we explained in the background section above, this rendition of the sequence of events is based on an erroneous view of the video evidence and application of the summary judgment standard.  A reasonable jury could conclude that Segrain dropped the razor either as he was falling to the ground from Glendinning's leg sweep or just after he hit the ground.[8]  Either way, the video evidence leaves no doubt that Segrain dropped the razor and Glendinning grabbed the razor off the floor before Duffy pepper sprayed Segrain for the second time.  Furthermore, viewing the facts in the light most favorable to Segrain and drawing all rational inferences in his favor, a reasonable jury could conclude that Duffy had a clear view of Glendinning grabbing the razor off the floor to toss it out of Segrain's reach before Duffy applied the second spray to Segrain's face.

Under this view of the sequence of events, a reasonable jury may conclude that Duffy's use of pepper spray was a greater

---

[8] Duffy sprayed Segrain with pepper spray for the first time after Glendinning initiated the leg sweep -- around the time Segrain landed on the floor, or shortly thereafter.

than _de minimis_ use of force.  A substantial body of caselaw
suggests that the application of pepper spray to a person's face
after the person has already been fully subdued can be considered
greater than _de minimis_ force.  In the First Circuit, we have
stated generally that the "excessive use of tear gas by prison
officials can amount to an Eighth Amendment violation."
_Torres-Viera_ v. _Laboy-Alvarado_, 311 F.3d 105, 108 (1st Cir. 2002).
Multiple other circuits have found that the use of pepper spray
can be more than _de minimis_ force when used against a person who
does not pose a substantial threat and/or when the spray is used
in quantities greater than necessary.  _See, e.g._, _Treats_, 308 F.3d
at 873 ("A basis for an Eighth Amendment claim exists when, as
alleged here, an officer uses pepper spray without warning on an
inmate who may have questioned his actions but who otherwise poses
no threat."); _Dean_ v. _Jones_, 984 F.3d 295, 303 (4th Cir. 2021)
("[W]e have no difficulty concluding -- as we have before -- that
a reasonable jury could find that a sustained blast of pepper spray
directly to the face constitutes something more than de minimis
force."); _Williams_ v. _Benjamin_, 77 F.3d 756, 763 (4th Cir. 1996)
("It is generally recognized that 'it is a violation of the Eighth
Amendment for prison officials to use mace, tear gas or other
chemical agents in quantities greater than necessary or for the
sole purpose of infliction of pain.'" (quoting _Soto_ v. _Dickey_, 744
F.2d 1260, 1270 (7th Cir. 1984))); _Furnace_ v. _Sullivan_, 705 F.3d

1021, 1028 (9th Cir. 2013) (agreeing with and citing the Fourth Circuit's statement in Williams that use of "chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain" can constitute an Eighth Amendment violation); cf. Danley v. Allen, 540 F.3d 1298, 1309 (11th Cir. 2008) ("When jailers continue to use substantial force against a prisoner who has clearly stopped resisting -- whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated -- that use of force is excessive."), overruled in part on other grounds as recognized in Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010); Thompson v. Commonwealth of Virginia, 878 F.3d 89, 103 (4th Cir. 2017) ("[T]here is a clear consensus among the circuits . . . that infliction of pain and suffering without penological justification violates the Eighth Amendment in an array of contexts.").

And in certain cases, the type of physical reaction an incarcerated person has to the pepper spray could establish that the force used was greater than de minimis. See Tedder v. Johnson, 527 F. App'x 269, 274 (4th Cir. 2013) (finding a genuine issue of material fact on the objective component of an Eighth Amendment excessive force claim and denying qualified immunity based on an "adverse physical reaction" to pepper spray, including "gagging, breathing difficulty, and vomiting," which "establish[ed] that the nature of the force [the officer] used . . . was nontrivial").

Here, Segrain alleges that he experienced intense pain from the pepper spray, was temporarily blinded, felt unable to breathe, and felt like he was going to die. The video of Segrain in the holding cell appears to support Segrain's allegations of pain and temporary blindness. Based on the evidence of Segrain's physical reactions to the spray in addition to the other evidence related to the sequence of events described above, a reasonable jury could consider Duffy's use of pepper spray against Segrain to be a greater than <u>de minimis</u> use of force.

### b. Subjective Prong

We hold that the district court also erred in its analysis of Duffy's use of pepper spray under the subjective prong. There, the district court concluded that Duffy's use of pepper spray "was in good faith" because Segrain "created a threat to the corrections officers and himself when he failed to drop the razor in his hands despite orders to do so and attempts to remove it from his hands." <u>Segrain</u>, 2023 WL 6142234, at *9. It further concluded that "[t]he threat did not cease when Defendant Glendinning applied the leg sweep" because "[i]t was not until Defendant Duffy released the second microburst [of pepper spray] that Defendant Glendinning announced he had the razor"; and "[o]nce [Segrain] dropped the razor, the threat extinguished and the officers used no further force." <u>Id.</u> Once again, this rendition of the facts reflects a flawed application of the summary judgment

standard.  A reasonable jury could conclude that Segrain dropped
the razor before Duffy applied the second burst of pepper spray.
They could further conclude that Duffy could see Glendinning grab
and toss the razor out of Segrain's reach before Duffy pepper
sprayed Segrain a second time.

Although the subjective prong of the Eighth Amendment
analysis turns on "whether force was applied in a good faith effort
to maintain or restore discipline or maliciously and sadistically
for the very purpose of causing harm," Whitley, 475 U.S. at 320-21
(1986) (quoting Johnson, 481 F.2d at 1033), the applicable legal
standard acknowledges that "direct evidence of motive or intent
may be hard to come by," Dean, 984 F.3d at 302.  Accordingly, the
trier of fact may "infer the existence of th[e] subjective state
of mind required for an Eighth Amendment violation" from the
Whitley factors.  Id. (alteration in original) (quoting Brooks v.
Johnson, 924 F.3d 104, 116 (4th Cir. 2019)).  "Summary judgment is
not appropriate" if "a reasonable jury could find, based on
inferences drawn under the Whitley factors or other evidence, that
correctional officers used force maliciously to punish or
retaliate against an inmate."  Id. at 302-03 (citing Brooks, 924
F.3d at 116).

> As a reminder, the Whitley factors include:
>
> [(1)] the extent of the threat to the safety
> of staff and inmates, as reasonably perceived
> by the responsible officials, [(2)] the need

> for the application of force, [(3)] the
> relationship between the need and the amount
> of force that was used, [(4)] the extent of
> the injury inflicted, and [(5)] any efforts
> made to temper the severity of a forceful
> response.

Staples, 923 F.3d at 13 (cleaned up) (quoting Whitley, 475 U.S. at 321). Applying these factors to the facts viewed in the light most favorable to Segrain, a reasonable jury could view the extent of the threat to the safety of staff and inmates as low where Segrain was handcuffed and surrounded by six officers, where the alleged potential weapon was a prison-issued shaving razor,[9] and where the jury could find that Segrain did not intentionally retain the razor after leaving the shower area or intend to use it for any nefarious purpose. Instead, the jury could find that Segrain only held the razor because the officers failed to follow their usual protocol of collecting the razor back from Segrain prior to escorting him out of the shower area and he did not have any other opportunity to return the razor. A reasonable jury could further conclude that Duffy could and should have perceived that the threat

---

[9] Segrain points to evidence in the record establishing that prison officials viewed the safety razor issued to incarcerated individuals, which was designed for use in a prison context, to be sufficiently safe that incarcerated individuals were permitted to handle these razors in the presence of others including, under certain circumstances, guards. Thus, while the record also contains countervailing testimony explaining how such a razor could be a threat, a reasonable jury could agree with Segrain that the safety razor he was holding did not inherently make him an immediate threat to the safety of those around him.

was low or non-existent certainly before his second spray, particularly given he had already sprayed Segrain once. The jury could conclude that Duffy should have perceived this before he applied pepper spray for the second time because by that time, Segrain had dropped the razor and Glendinning had grabbed the razor to toss it out of Segrain's reach -- in clear view of Duffy. See Furnace, 705 F.3d at 1029 ("[T]he district court properly found that it remained a disputed fact whether [the incarcerated person] posed a threat to the officers, such that they were justified in discharging pepper spray on [them].").

Under the second factor and this view of the facts, the jury could find that there was no need for the application of force in the form of pepper spray, particularly after the first spray, because Segrain no longer (or never) presented any threat to the officers, himself, or other inmates at that time.[10] See Furnace, 705 F.3d at 1029 ("[W]e are not persuaded, after resolving all factual disputes in the light most favorable to [the incarcerated person], that the use of violent force . . . was necessary to gain [their] compliance."). And accordingly, under the third factor,

---

[10] Moreover, the jury could conclude, based on the video evidence and testimony, that Segrain was not given sufficient time to comprehend and respond to Glendinning's order to drop the razor before Glendinning executed the leg sweep and Duffy first pepper sprayed Segrain. Thus, they could conclude that Segrain did not refuse to comply with the order to drop the razor and pose a threat for that reason.

the jury could find that the amount of force used was disproportionately high in relation to the minimal or nonexistent need for force. See Danley, 540 F.3d at 1309 ("Once a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need.").

Under the fourth factor, the extent of the injuries suffered, a reasonable jury could find that the application of pepper spray to Segrain's face caused him temporary blindness, difficulty breathing, and physical pain in the immediate aftermath of the spray. Segrain does not allege that he experienced any longer-term physical injuries. Nor is it necessary that Segrain allege a lasting injury to prevail on his Eighth Amendment claim. See Treats, 308 F.3d at 874. Nonetheless, the jury could find that the pepper spray caused Segrain to experience an increase in anxiety and depression.

Finally, under the fifth factor, a reasonable jury could find that the "efforts made to temper the severity of a forceful response" -- the use of pepper spray -- were lacking, Staples, 923 F.3d at 13 (quoting Whitley, 475 U.S. at 321), or that the circumstances following the forceful response weighed against Duffy, see Iko v. Shreve, 535 F.3d 225, 240 (4th Cir. 2008). Although the officers eventually took Segrain to receive a decontamination shower, as they were required to under RIDOC policy, the jury could conclude that the officers unnecessarily

and substantially prolonged the pain Segrain experienced from the pepper spray.[11]  The video and testimonial evidence shows that Segrain was left handcuffed while in the holding cell so that he could not use his hands to wash the pepper spray off his face, and that no officer helped him locate the sink in the corner of the room while he was calling out in pain and wandering blindly around the cell.

Indeed, over the course of the thirteen minutes during which Segrain was in the cell, the video shows the officers milling about outside the holding cell, not appearing to be occupied for much of the time or in a rush to move Segrain to another location. The rationale the officers have given for the delay in treating Segrain has also been inconsistent: Duffy initially asserted in an affidavit that the delay was due to "Segrain's act of flooding the cell" because "the area had to be cleaned for safe transport." But the officers' area video appears to refute that explanation. Specifically, that video shows Segrain being taken out of the holding cell before anyone mopped up the water.  Duffy then testified, and the district court appeared to conclude, that the delay was due to the need to find enough staff to move Segrain to the decontamination area.  See Segrain, 2023 WL 6142234, at *10

---

[11] We will discuss in greater detail below Segrain's separate Eighth Amendment claim against the officers based on their delay in treating the effects of the pepper spray. See infra Section III.A.3.

(noting that Duffy "delayed decontamination to seek out staff to transport Plaintiff to decontamination"). A jury could also choose to disbelieve this alternative rationale after viewing the officers' area video, which shows numerous officers lingering in or around the officers' area who did not appear to be occupied during the time Segrain was in the cell. Moreover, the jury could wholly discredit Duffy's reasons for the delay based on the inconsistency between Duffy's affidavit and his deposition testimony. See Holmes v. Slay, 895 F.3d 993, 1002 (8th Cir. 2018) (explaining that "the jury [is] entitled to discredit" testimony that is inconsistent "and draw inferences about their motives for testifying in the way that they did").

Viewing this evidence in the light most favorable to Segrain, a reasonable jury could conclude that the officers could and should have moved more quickly to temper the severity of the effects of the pepper spray by promptly decontaminating Segrain, and that there was no sufficient justification for the delay.[12]

---

[12] A reasonable jury may also reject the argument that Duffy tempered the severity of his application of force by discharging only a small quantity of pepper spray. The officers' area video shows that the quantity sprayed was large enough to leave a puddle on the floor underneath Segrain, and Duffy's testimony that "hardly anything came out" of the first spray of pepper spray suggests that a larger quantity of spray was administered in the second spray. Additionally, the jury may conclude that the use of a relatively small quantity of pepper spray "is of no significant value to [Duffy]" because no pepper spray "was required at all to force compliance from an [incarcerated person] who was already

Given that a reasonable jury could find that a majority of these factors weigh against Duffy for the reasons described above, the jury could reasonably infer that Duffy's use of pepper spray was "maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21 (citation omitted); see Tedder, 527 F. App'x at 273 (concluding that "[a]pplication of the Whitley factors would permit a trier of fact to" find malice, in part because "there [was] evidence suggesting that there was no need for the application of force at the time that [the officer] applied it" and "the record contain[ed] sufficient facts from which a trier of fact could conclude that [the incarcerated person] posed no threat at all"). Accordingly, the jury could find that both the objective and subjective prongs of the excessive force analysis were satisfied, and thus that Duffy's use of pepper spray against Segrain constituted an Eighth Amendment violation.[13]

---

complying and unable to resist." Tedder v. Johnson, 527 F. App'x 269, 273 (4th Cir. 2013).

[13] Our precedent in Staples v. Gerry, 923 F.3d 7 (1st Cir. 2019), does not compel a different result. There, the plaintiff, an incarcerated person, repeatedly refused orders by a correctional officer to "cuff up," meaning to "place[] his hands through the cell's tray slot so the officer can handcuff him before opening the cell door." Id. at 12. The officer gave the plaintiff an explicit warning that he would be sprayed with pepper spray if he did not obey the order, and the officer gave the plaintiff time to respond. Id. After the plaintiff responded verbally, continuing to decline to follow the order, the officer sprayed him with pepper spray. Id. We began our analysis by emphasizing the need to examine the "totality of the circumstances, including the provocation, the amount of spray used, and the purposes for which the spray is used to determine the validity of the use of spray in

### c.  Qualified Immunity

Appellees argue that, even if Duffy's use of pepper spray constituted an Eighth Amendment violation, qualified immunity shields him from liability.  We proceed to decide this legal question even though the district court did not reach it.  See Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 69-73, 74-75 (1st Cir. 2016) (reaching both steps of the qualified immunity analysis and denying qualified immunity at summary judgment on claims that the district court decided on only the first step -- finding no constitutional violation -- without reaching the second step); Asociación de Periodistas de P.R. v. Mueller, 529 F.3d 52, 58-62 (1st Cir. 2008) (same, under older version of the qualified immunity standard); see also Stamps v. Town of Framingham, 813 F.3d 27, 39 (1st Cir. 2016) ("Whether the law was clearly

---

the prison environment." Id. at 17 (cleaned up) (quoting Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996)).  We affirmed the grant of summary judgment to the officer on the Eighth Amendment claim, emphasizing that, under the particular circumstances of the case, no reasonable jury could "conclude that [the officer] acted for a reason other than the one that he gave": that he "used pepper spray for a valid purpose -- to extract [the plaintiff] from his cell -- in response to a valid provocation -- [the plaintiff] refusing multiple orders over several days to leave his cell." Id. (cleaned up).  Here, in contrast, a reasonable jury could find that Segrain was not given sufficient time to comply with any order to drop the razor before force was used against him.  It could also find that Duffy did not have a valid reason for using pepper spray at the time that he did and under the circumstances, particularly at the time of the second pepper spray.  The jury could then infer malice based on the Whitley factors, as explained above.

established is itself a question of law for the court." (citing
Elder v. Holloway, 510 U.S. 510, 516 (1994))).

Because there is "sufficient evidence to make out an
excessive force claim, [Duffy] is not entitled to qualified
immunity on the first" step of the qualified immunity analysis.
Toledo-Dávila, 813 F.3d at 72. At this summary judgment stage, we
find that Duffy is also not entitled to qualified immunity on the
second step because, for the reasons set out below, clearly
established law as of June 28, 2018 prohibited Duffy from
unnecessarily spraying Segrain with pepper spray at a time when he
was restrained and did not pose any reasonable threat.

As noted above, this circuit has acknowledged that,
under some circumstances, "excessive use of tear gas by prison
officials can amount to an Eighth Amendment violation."
Torres-Viera, 311 F.3d at 108. Out-of-circuit cases published
before June 28, 2018 have more specifically defined and applied
that principle. The Eleventh Circuit has stated that "[w]hen
jailers continue to use substantial force against a prisoner who
has clearly stopped resisting -- whether because he has decided to
become compliant, he has been subdued, or he is otherwise
incapacitated -- that use of force is excessive." Danley, 540
F.3d at 1309. And with respect to cases in which the incarcerated
person poses a minimal threat, the Eighth Circuit has held that
"[a] basis for an Eighth Amendment claim exists when . . . an

officer uses pepper spray without warning on an inmate who may have questioned his actions but who otherwise poses no threat." Treats, 308 F.3d at 873.

The Fourth Circuit cited Seventh Circuit precedent dating back to 1984 to explain that "[i]t is generally recognized that 'it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" Williams, 77 F.3d at 763 (quoting Soto, 744 F.2d at 1270). The Fourth Circuit has since reiterated and applied this principle on several occasions to deny qualified immunity at the summary judgment stage where officers gratuitously used pepper spray on incarcerated individuals. See Iko, 535 F.3d at 231-32, 240 (holding that officer's use of pepper spray against an incarcerated person when they failed to comply with orders to "cuff up" or come to the door of his cell for "cell extraction" constituted an Eighth Amendment violation, and that the "right to be free from excessive use of pepper spray was clearly established, preventing an award of qualified immunity"); Tedder, 527 F. App'x at 270-71 (holding that an Eighth Amendment claim survived summary judgment where a corrections officer allegedly sprayed mace on an incarcerated person who attempted to pass through a gate to get their medication with permission from a second officer stationed at a different location); Boone v. Stallings, 583 F. App'x 174,

176 (4th Cir. 2014) (stating that Fourth Circuit precedent "establishes that the use of pepper spray on a docile prisoner could qualify as excessive force" and concluding that "if a jury were to believe [the plaintiff's] allegation that [they were] on the ground, already restrained in handcuffs when [the officer] deployed the pepper spray, the jury could conclude that [the plaintiff] was subjected to unconstitutionally excessive force"); Greene v. Feaster, 733 F. App'x 80, 81-82 (4th Cir. 2018) (holding use of pepper spray "for two to three seconds," where spray allegedly occurred "absent any provocation" because the plaintiff stopped resisting and complied with the officers' orders two minutes earlier, constituted a violation of clearly established Eighth Amendment law).

The Ninth Circuit has "agree[d] with [its] sister circuits that 'it is generally recognized that it is a violation of the Eighth Amendment for prison officials to use mace, tear gas or other chemical agents in quantities greater than necessary or for the sole purpose of infliction of pain.'" Furnace, 705 F.3d at 1028 (cleaned up) (quoting Williams, 77 F.3d at 763). In Furnace, an incarcerated person alleged that two correctional officers pepper sprayed him without warning after he put his hand into the food port of his cell during a dispute with the officers over whether he and his cellmate were entitled to vegetarian meals. Id. at 1024-25. The Ninth Circuit found that, viewing the facts

in the light most favorable to the incarcerated person, "a
significant amount of force was employed without significant
provocation from [the incarcerated person] or warning from the
officers." Id. at 1030. It therefore reversed the district
court's grant of qualified immunity to the officers on summary
judgment. Id.

Finally, a district court in this circuit has ruled that
an officer's "use of [pepper spray] on a defenseless and
non-resistant inmate" can be considered "non-de minimis force
'applied maliciously and sadistically for the very purpose of
causing harm.'" Perry v. Dickhaut, 125 F. Supp. 3d 285, 297 (D.
Mass. 2015) (quoting Skinner v. Cunningham, 430 F.3d 483, 488 (1st
Cir. 2005)). The court there denied qualified immunity at summary
judgment to an officer who had sprayed an incarcerated person six
times when the person refused to comply with an order to return to
a cell, including at least two sprays after he had stopped
resisting. Id. at 297-98. The court concluded:

> Given the circumstances surrounding [the
> officer's] use of [pepper spray] -- especially
> the timing of the fifth and sixth sprays -- a
> reasonable juror could conclude that [the
> officer] was fed up with Plaintiff for being
> disruptive, and purposefully retaliated by
> spraying Plaintiff in the face after [they]
> had stopped resisting. Any reasonable prison
> official would have understood that such a
> malicious infliction of unnecessary pain --
> even if did not result in enduring injury --
> would violate a prisoner's constitutional
> rights. Therefore, [the officer] is not

> entitled to qualified immunity on the
> excessive force claim.

Id. at 298.

In light of this body of caselaw, we conclude that "a robust consensus of persuasive authority," Irish, 979 F.3d at 77, has established that the use of pepper spray by prison officials against a detained person when that person is no longer resisting and no longer presents any reasonable safety threat is an Eighth Amendment violation, see id. at 76 ("A 'robust consensus' does not require the express agreement of every circuit. Rather, sister circuit law is sufficient to clearly establish a proposition of law when it would provide notice to every reasonable officer that his conduct was unlawful."). Although "each of the[] cases [described above] presented unique sets of facts that in some respects differ from the facts presented in the case at hand," Stamps, 813 F.3d at 42, "[the Supreme] Court's case law does not require a case directly on point for a right to be clearly established" if "existing precedent [has] placed the statutory or constitutional question beyond debate," Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (quoting White, 580 U.S. at 79). That is the case here: existing precedent as of June 28, 2018 made clear to every reasonable officer that the unnecessary use of pepper spray on an incarcerated person who was restrained and did

not pose any reasonable threat constitutes an Eighth Amendment violation.

Prison regulations governing correctional officers' conduct can also be relevant to determining whether a right was clearly established. See Hope v. Pelzer, 536 U.S. 730, 741-44 (2002) (looking to Alabama Department of Corrections regulations to support the conclusion that prison guards were on notice of constitutional limitations on the use of force and violated clearly established constitutional rights); Irish, 979 F.3d at 77 ("A lack of compliance with state law or procedure does not, in and of itself, establish a constitutional violation, but when an officer disregards police procedure, it bolsters the plaintiff's argument . . . that 'a reasonable officer in [the officer's] circumstances would have believed that [their] conduct violated the Constitution.'" (second alteration in original)); Furnace, 705 F.3d at 1027-28 ("Here, [a prison regulation] bears directly on the situation that the officers confronted, and is therefore relevant to determining whether the officers could have thought their conduct was reasonable and lawful."); Treats, 308 F.3d at 875 ("Prison regulations governing the conduct of correctional officers are also relevant in determining whether an inmate's right was clearly established.").

RIDOC policy states that "RIDOC Officers may only use force when necessary," they "may only use the reasonable force

necessary to accomplish the required task," and "[o]nce the threat or resistance displayed by a subject stops or diminishes, force utilized by Officers in response must cease or diminish."  A reasonable jury could find that Duffy used pepper spray unnecessarily against Segrain after any "threat or resistance" by Segrain had "stop[ped] or diminishe[d]."  Such an action would violate RIDOC policy, which bolsters Segrain's position that a reasonable officer in Duffy's circumstances would have known that his conduct was unlawful.  See, e.g., Hope, 536 U.S. at 741-44; Irish, 979 F.3d at 77.

Considering the RIDOC regulation on top of the substantial body of caselaw discussed above, we conclude that the law governing Duffy's use of unconstitutional excessive force was clearly established at the time of the alleged violation. Accordingly, Duffy is not entitled to qualified immunity for his use of pepper spray against Segrain at this stage of the litigation.  "[O]ur denial of immunity on [Segrain's] version of the events leaves th[is] claim[] for trial, where [Duffy] may try to persuade the jury that he did not do what he is accused of doing."  Stamps, 813 F.3d at 42 (cleaned up) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 40 (1st Cir. 2011)).

### 3. Delayed Decontamination by All Three Officers

Segrain argues next that the district court erred in holding that the officers' delay in providing him the opportunity

to decontaminate from the pepper spray could not constitute an
Eighth Amendment violation.  On this point, the district court
concluded that "[t]hough the reason for the delay is in dispute,"
Segrain failed to put forth sufficient evidence that the delay was
malicious and "the fact of the delay is not a constitutional
affront." Segrain, 2023 WL 6142234, at *10.

        To refute the district court's conclusion on his
decontamination claim, Segrain cites several out-of-circuit cases
in support of his argument that a reasonable jury could find that
the decontamination delay constituted an Eighth Amendment
excessive force violation.  But we need not reach the
constitutional issue because we find that it was not clearly
established as of the date of the incident that a delay in
decontamination from pepper spray for the length of time Segrain
alleges constituted an Eighth Amendment violation.

        One of the cases Segrain cites, Jacoby v. Mack, 755 F.
App'x 888 (11th Cir. 2018), was published in November 2018 -- too
late to be relevant to the analysis of established law as of June
28, 2018.  Segrain relies heavily on Danley v. Allen, a case in
which the Eleventh Circuit found that holding a man sprayed with
pepper spray in a cell with pepper spray in the air and on his
clothes for twenty minutes before permitting him to decontaminate
could amount to an unconstitutional use of excessive force.  540

F.3d at 1304, 1307-09.[14]  He also cites <u>Nasseri</u> v. <u>City of Athens</u>, another Eleventh Circuit case that relied on <u>Danley</u> to conclude that an officer's confinement of a person detained pre-trial in an unventilated patrol car for an hour without decontamination after they were sprayed by an officer in the face with pepper spray amounted to unconstitutional excessive force.  <u>See</u> 373 F. App'x 15, 18-19 (11th Cir. 2010) (per curiam).  Next, Segrain cites a Tenth Circuit decision denying summary judgment to officers on an Eighth Amendment excessive force claim after noting that whether the objective prong was satisfied "turn[ed] in part on" material disputes of fact as to "how long plaintiff was sprayed [with pepper spray] and whether he was adequately irrigated afterwards or left to suffer unnecessarily."  <u>Norton</u> v. <u>City of Marietta</u>, 432 F.3d 1145, 1154 (10th Cir. 2005).

Finally, Segrain cites an Eastern District of California decision that did not directly address whether a delay in decontamination supported an Eighth Amendment claim there because "it [was] undisputed that plaintiff was allowed to wash the pepper spray off following the incident, and [they] received medical care thereafter."  <u>Williams</u> v. <u>Young</u>, No. 2:12-CV-0318, 2015 WL 4617985,

---

[14] The excessive force claim in <u>Danley</u> was under the Fourteenth Amendment as opposed to the Eighth Amendment because Danley was detained pre-trial at the time, not post-conviction.  <u>See</u> 540 F.3d at 1306.  However, the court there applied the same standard as that applicable at the time for Eighth Amendment excessive force claims.  <u>See</u> <u>id.</u>

at *15-16 (E.D. Cal. July 31, 2015), report and recommendation adopted, No. 2:12-CV-0318, 2015 WL 6163436 (E.D. Cal. Oct. 15, 2015). Nonetheless, that court noted that "courts have concluded that the Eighth Amendment can be violated when, after a prisoner is pepper sprayed (even for a legitimate reason), officers then withhold appropriate medical attention." Id. at *11. In support of that point, the court cited Norton (described above) as well as cases in which an opportunity to properly decontaminate was allegedly not provided at all on the day of the use of pepper spray. See id. (first citing Walker v. Bowersox, 526 F.3d 1186, 1189 (8th Cir. 2008); then citing Norton, 432 F.3d at 1153-54; then citing Foulk v. Charrier, 262 F.3d 687 (8th Cir. 2001); and then citing Iko, 535 F.3d at 239-40).

In response, the appellees cite two cases they assert weigh in the opposite direction -- against finding the delayed decontamination to be an Eighth Amendment violation. The first found no Eighth Amendment violation for a pepper spray excessive force claim generally (as opposed to a delayed decontamination claim specifically) where "the effects of the [pepper spray] cleared within 45 minutes" after the person "was twice taken to the infirmary and treated with water during that period." Jones v. Shields, 207 F.3d 491, 495 (8th Cir. 2000). The second case considered the claim that officers failed to decontaminate an incarcerated person for eight hours after the use of pepper spray

to be a deliberate indifference (as opposed to excessive force) claim and found no Eighth Amendment violation given the lack of evidence that such a delay caused injury or caused the plaintiff to otherwise suffer any harm. See Jacoby v. Baldwin Cnty., 596 F. App'x 757, 766-67 (11th Cir. 2014). Though these cases involve distinguishable factual circumstances and/or legal standards, they are relevant to some extent and suggest some degree of uncertainty in the legality of the alleged delay in Segrain's decontamination.

Considering this body of caselaw as a whole, we hold that Segrain has not shown that "a robust consensus of cases of persuasive authority" put the "constitutionality of the officer[s' alleged] conduct 'beyond debate.'" Wesby, 583 U.S. at 63 (quoting al-Kidd, 563 U.S. at 741-42). Many of the cases cited in Williams are distinguishable because they involved significantly longer delays in decontamination than the delay Segrain alleges. Although the other out-of-circuit cases Segrain cites provide more direct support for his claim, see Danley, 540 F.3d at 1307-09; Nasseri, 373 F. App'x at 18-19; see also Norton, 432 F.3d at 1154, they too are distinguishable and alone do not amount to the "robust consensus" needed to demonstrate clearly established law. This is especially so in the face of the cases appellees cite showing courts finding no constitutional violation for similar conduct or longer decontamination delays than the one alleged here. See Jones, 207 F.3d at 495; Jacoby, 596 F. App'x at 766-67.

Thus, the law in this area was not "sufficiently clear that every reasonable official would understand that" a delay in decontamination for the length of time Segrain alleges was unlawful. Wesby, 583 U.S. at 63 (cleaned up). Accordingly, the officers are entitled to qualified immunity on Segrain's claim that the delay in decontamination violated his Eighth Amendment rights.

### 4. "Integral Participant" Theory of Liability Against Meleo

Segrain's final Eighth Amendment argument is that Meleo is liable for an Eighth Amendment violation because he was "an integral participant in the[] uses of force" by the other officers.[15]   The government asserts that Segrain forfeited this argument because he failed to sufficiently present it to the district court, and that even if not forfeited, the integral participant theory "has no application here."

In his opposition to the motion for summary judgment, Segrain outlined the basic law on the integral participant theory of liability with citations to relevant caselaw and asserted that Meleo "was an integral participant in the use of force" and "in Defendants' decision to delay decontamination and place Mr. Segrain in a holding cell."   We agree with Segrain that this

---

[15] Segrain's counsel stated at oral argument that Segrain is no longer pursuing the argument that Meleo is liable for an Eighth Amendment violation based on his alleged "failure to intervene." We therefore do not discuss that issue.

briefing before the district court was sufficient to avoid forfeiture of the general issue below. However, we disagree that Meleo is liable for any Eighth Amendment violation under this theory.

We have already found that Segrain has not shown that the leg sweep against him violated clearly established law as of June 2018. See supra section III.A.1. Accordingly, we need not reach the issue of whether Meleo's conduct in relation to the leg sweep violated the constitution because Meleo, like Glendinning, is entitled to qualified immunity on Segrain's claim that the leg sweep was an unconstitutional use of excessive force. Likewise, Meleo is entitled to qualified immunity on Segrain's delayed decontamination excessive force claim because the alleged "unlawfulness of" that delay was not "clearly established at the time," as we concluded above. Wesby, 583 U.S. at 63 (quoting Reichle, 566 U.S. at 664); see supra section III.A.3. That leaves only the excessive force claim based on Duffy's use of pepper spray. However, Segrain has not made any argument -- either before the district court or in his opening brief to us -- explaining how Meleo was an "integral participant" in Duffy's allegedly unconstitutional use of pepper spray, specifically. Thus, Segrain has waived that claim. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). We affirm the district court's grant of

summary judgment to Meleo on Segrain's Eighth Amendment claim under
42 U.S.C. § 1983.

### B. State Law Claims

Finally, Segrain appeals the district court's grant of
summary judgment on his remaining five state law claims: state
tort claims for negligent infliction of emotional distress,
battery, intentional infliction of emotional distress, and
excessive force (counts four, five, eight, and nine); and a state
constitutional claim for violation of the right to be free from
cruel and unusual punishment under Article I, Section 8 of the
Rhode Island Constitution (count seven).  The district court
decision assessed and dismissed each of these state law claims
individually.  Segrain's opening brief on appeal asserts broadly
that "[t]he district court's decision to grant summary judgment on
[Segrain's] state law claims . . . suffers from the same errors
that led it to grant summary judgment on the Eighth [A]mendment
claim." Consequently, Segrain's brief argues, the grant of summary
judgment on the state law claims should be reversed for "the same
reasons" that he alleged summary judgment should be reversed on
the Eighth Amendment claim.

That brief argument is sufficient to avoid waiver of
Segrain's challenge to the district court's ruling on Segrain's
cruel and unusual punishment claim under Article I, Section 8 of
the Rhode Island Constitution.  As the district court correctly

noted, the Rhode Island Supreme Court has held that this provision of the Rhode Island state constitution is "identical" to its federal counterpart. See State v. Monteiro, 924 A.2d 784, 795 (R.I. 2007); Segrain, 2023 WL 6142234, at *12. Additionally, Rhode Island "recogni[zes] . . . a qualified immunity defense under state law analogous to the federal doctrine established by the United States Supreme Court." Hatch v. Town of Middletown, 311 F.3d 83, 90 (1st Cir. 2002); see Bogosian v. R.I. Airport Corp., No. 17-1550, 2018 WL 11438429, at *1-5 (1st Cir. Nov. 21, 2018) (dismissing Rhode Island state law claims on qualified immunity grounds); J.R. v. Gloria, 599 F. Supp. 2d 182, 205 (D.R.I. 2009) (same), aff'd, 593 F.3d 73 (1st Cir. 2010); Carter v. Lindgren, 502 F.3d 26, 33 (1st Cir. 2007) (same). Thus, the officers are entitled to qualified immunity for the state constitutional claims relating to the leg sweep and delayed decontamination conduct for the same reasons we determined that they are entitled to qualified immunity for the corresponding federal Eighth Amendment claims. See Carter, 502 F.3d at 33.

Our analysis of Duffy's use of pepper spray under the Eighth Amendment and federal qualified immunity doctrine also applies equally to Segrain's claim that this conduct constituted cruel and unusual punishment in violation of the state constitution. However, the district court noted that "[t]he Rhode Island Supreme Court has not directly answered the question of

whether [Article I, Section 8] is self-executing and creates an implied cause of action." Segrain, 2023 WL 6142234, at *12. The briefing before us does not address this significant question of state law that the district court noted (and did not decide), see id., but which would need to be resolved before granting or denying summary judgment on this claim. Accordingly, we vacate the district court's judgment as to the state constitutional claim against Duffy and remand to the district court to determine in the first instance whether Article I, Section 8 is self-executing and creates an implied cause of action. See United States v. Almeida, 710 F.3d 437, 442 (1st Cir. 2013) ("Because the parties have not briefed the question of which guideline applies under the proper standard, we believe the most prudent course is to remand to the district court to consider that question in the first instance."); AccuSoft Corp. v. Palo, 237 F.3d 31, 46 (1st Cir. 2001) (vacating and remanding to district court to decide a question involving an issue that "was not briefed on appeal").

        Moving on to Segrain's other state law claims, we agree with the appellees that Segrain's undeveloped, nonspecific challenge to these claims in his briefing before us is insufficient to avoid waiver of these challenges. Contrary to Segrain's assertion that the district court concluded that the legal standards for all of the remaining state law claims "are essentially the same as [the standards for] the Eighth Amendment

excessive force claim," the district court noted multiple aspects of the state law claims that are distinct from or irrelevant to the Eighth Amendment legal standard. For example, the district court's grant of summary judgment on both the negligent and intentional infliction of emotional distress claims related to requirements for those claims under Rhode Island law that are not requirements under the Eighth Amendment legal standard. See Segrain, 2023 WL 6142234, at *11. But Segrain's opening brief provides no explanation of why those rulings on issues distinct from any Eighth Amendment requirement were erroneous.

We have long held that "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Zannino, 895 F.2d at 17. Thus, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." Id.; see also, e.g., Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010) (finding claim waived where petitioners "h[ad] not formulated any developed argumentation in support of that claim"). Accordingly, we hold that Segrain's challenges to his state law claims for negligent infliction of emotional distress, battery, intentional infliction of emotional distress, and excessive force are waived for lack of developed argumentation, and we affirm the grant of summary judgment on those claims as to all appellees.

**IV. Conclusion**

For the reasons stated above, we <u>reverse</u> the district court's judgment as to the Eighth Amendment claim regarding Duffy's use of pepper spray, <u>vacate</u> the district court's judgment as to the Rhode Island Constitution Article I, Section 8 claim regarding Duffy's use of pepper spray, and <u>remand</u> for proceedings consistent with this opinion.[16]  We <u>affirm</u> the district court's judgment on all other grounds.  No costs are awarded.

---

[16] As Segrain conceded in his briefing to the district court, he is no longer pursuing the injunctive relief he originally sought in his complaint.  Additionally, though Segrain's complaint seeks a declaratory judgment for the alleged "violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 2 and 8 of the Rhode Island Constitution," he does not seek declaratory relief for any alleged Eighth Amendment violation.  Section 1983 only provides a cause of action for <u>monetary damages</u> against state actors sued in their <u>individual</u> capacities.  <u>See</u> 42 U.S.C. § 1983; <u>Kelley</u>, 288 F.3d at 6; <u>Hafer</u>, 502 U.S. at 23.  There is no right of action under § 1983 against the state itself or state officials sued in their official capacities, because such officers are not considered "persons" subject to suit under the statute.  <u>See</u> <u>Will</u> v. <u>Mich. Dep't of State Police</u>, 491 U.S. 58, 71 (1989); <u>Nieves-Marquez</u> v. <u>Puerto Rico</u>, 353 F.3d 108, 124 (1st Cir. 2003) ("No cause of action for damages is stated under 42 U.S.C. § 1983 against a state, its agency, or its officials acting in an official capacity.").  Furthermore, qualified immunity protects government officials sued in their individual capacities against claims for monetary damages for violations of clearly established statutory or constitutional rights.  <u>See</u> <u>Lawless</u> v. <u>Town of Freetown</u>, 63 F.4th 61, 67 (1st Cir. 2023).  Therefore, following the parties' previous agreement to dismiss counts one through three in the complaint and all individual capacity claims against the director of the Department of Corrections, as well as our dismissal of Segrain's Eighth Amendment claims against Glendinning and Meleo on qualified immunity grounds, the only remaining Eighth Amendment claim is the claim seeking monetary damages against Duffy, sued in his individual capacity, for his use of pepper spray against Segrain.